# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00988-COA

ANTHONY GERALD FOX                                                      APPELLANT

v.

STATE OF MISSISSIPPI                                                      APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 08/18/2022 |
| TRIAL JUDGE: | HON. ADRIENNE ANNETT HOOPER-WOOTEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | MERRIDA COXWELL |
| | PAUL McGERALD LUCKETT |
| | EUGENE CARLOS TANNER III |
| | CHARLES RICHARD MULLINS |
| | MICHAEL VERDIER CORY JR. |
| | FRANCIS STARR SPRINGER |
| | COURTNEY DENISE SANDERS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CASEY BONNER FARMER |
| DISTRICT ATTORNEY: | JODY EDWARD OWENS II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND RENDERED - 01/30/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**BARNES, C.J., FOR THE COURT:**

¶1. Anthony Fox appeals his conviction of culpable-negligence manslaughter. He argues, among other issues, that the credible evidence at trial was insufficient to prove the charge in the indictment that he caused the victim's death in a culpably negligent manner by "slamming [the victim's] head" into the pavement. He asserts that although the prosecution presented two eyewitnesses who testified that they saw him throw, slam, and kick the victim, the

prosecution's case was rendered "completely impossible based on the medical evidence." According to the prosecution's own medical expert, "there was no evidence of [the victim's] being beaten or kicked or body slammed." Rather, the prosecution's medical expert testified that the only injury found on the victim consisted of minor "abrasions," or scratches, which, when taking into account other contributing factors, caused a sequence of events that led to the victim's suffering a subdural hemorrhage and ultimately his death.

¶2. To sustain a culpable-negligence manslaughter conviction, the prosecution was required to prove beyond a reasonable doubt that Fox committed an act of negligence so gross as to be tantamount to a wanton disregard for or utter indifference to the safety of human life and that the victim's death was reasonably foreseeable under the circumstances. Based on the credible evidence presented at trial, no evidence establishes that Fox acted in a grossly negligent manner or that the victim's death from minor abrasions was reasonably foreseeable under the circumstances.

¶3. The State concedes error on this issue. After review, we likewise conclude that the evidence was insufficient to support the verdict. The conviction is reversed, and a judgment of acquittal is rendered in Fox's favor.

**FACTS**

¶4. We view the facts in the light most favorable to the prosecution, as required by our standard of review. *Buchanan v. State*, 316 So. 3d 619, 630 (¶49) (Miss. 2021).

¶5. On Sunday, January 13, 2019, Detective Anthony Fox with the Jackson Police Department (JPD) was called to assist with a search for a suspect involved in the death and

2

carjacking of Pastor Anthony Longino, who was killed while opening the doors to his church in the Washington Addition area of Jackson. Fox was a member of JPD's Special Weapons and Tactics Unit (SWAT) and received the search notice on his cell phone between 8 and 9 a.m. Fox and the other SWAT team members spent the day executing search warrants and interviewing potential suspects and informants.

¶6.     Around 6 p.m., law enforcement received a tip from an informant that a suspect in Longino's murder was hiding on Jones Avenue in Jackson. Officers received a picture of the suspect on their cell phones. The suspect was a juvenile male. A team of JPD officers, including Fox, Officer Lincoln Lampley, Officer Desmond Barney, Officer George Moore, and Officer Damon White, responded to Jones Avenue. Fox and Lampley rode together in an unmarked car. Barney drove separately in an unmarked car, and Moore and White followed in marked patrol cars. Officer Cornell Norman was also patrolling on Jones Avenue. Once on Jones Avenue, the officers saw people gathered outside a home, barbequing. Barney radioed the other officers and suggested that they try to interview individuals in the group to gather information about the murder.

¶7.     State witness Ronnie Arnold, a friend of sixty-two-year-old George Robinson, testified at trial that Robinson was hosting a barbeque at his home on Jones Avenue to celebrate his recent recovery from a stroke. Arnold testified that Robinson had just returned from the store when a man and woman approached Robinson's white sedan to ask him for change to buy some drinks from Connie Bolton, who sold snacks and canned drinks out of her home across the street. The man and woman had previously asked Arnold for money,

3

but he said no. Police vehicles were parked at the corner of Jones Avenue and Washington Street, and Arnold heard the officers telling people to get away from Robinson's car and telling Robinson to exit the car. Arnold testified that Robinson was saying to one of the officers, "I can't move too fast, sir"; "[h]e was trying to take his seatbelt off,"[1] but "Fox end up snatching the door open and grabbed him and throw him on the ground. . . . His head and . . . [h]is whole body" made contact with the ground; "[h]e hit it hard. He started bleeding . . . [from h]is head." Arnold testified that "Fox had his knee on [Robinson's] back and his arm on his shoulder, like, pushing his head up against the tire. His head was on the tire." When Robinson stood up, "blood was coming from his head."

¶8.     Bolton was also friends with Robinson and testified that she was outside her house across the street when she saw an officer, whom she identified as Fox at trial, "snatch [Robinson] out and then body slammed him . . . and dip him and swung him on the ground." She testified that she saw "his head hit the ground." The officer then "raised his foot and stomped him" with his booted foot. Children were present outside Bolton's home, and she took them inside so they would not be exposed to the altercation. She came back outside and began videoing the scene through Facebook Live. The prosecution introduced the video as an exhibit at trial. She can be heard on the video saying that she "d[id]n't know if he's going to jail or the hospital" because "they really worked him over" and that the police were "kicking people ass." She testified she could see Robinson standing next to the police SUV, and his "head was bleeding."

---

[1] Fox testified that Robinson was not wearing a seatbelt. For purposes of our review, we examine this conflicting evidence in the light most favorable to the State.

4

¶9.     Lampley testified that when he and Fox exited their patrol car on Jones Avenue, "[he] went in the front yard, around the barbecue grill, and Detective Fox went to a white 4-door sedan that was parked in front of that residence." Lampley saw Robinson in the driver's seat of the vehicle and a female standing by the driver's side. Lampley did not notice anything suspicious or illegal happening at the vehicle, but he "wasn't, necessarily, paying attention to the vehicle" and directed his attention "back to the individuals in the front yard barbequing."

¶10.    Before Lampley could talk to any of the individuals in the front yard, he "heard a commotion" behind him. Lampley heard Fox making "[l]oud commands."[2] Fox's voice sounded "distressed." Lampley went back to the white sedan where Robinson was still seated in the driver's seat. Fox was outside the car. Lampley testified that "Detective Fox had [Robinson's] left arm, the one closest to the door, secured, attempting to remove Mr. Robinson from the vehicle." Robinson was turned toward the center of the car with his hands between the driver's seat and center console. Fox continued "attempting to secure his left arm and get him out of the vehicle and giving him loud commands to exit the vehicle and stop reaching." Lampley drew his weapon but then holstered it to assist Fox "in pulling [Robinson] out of the vehicle." He testified: "I come in, directly behind Detective Fox . . . . I reach in with my right hand over Mr. Robinson's right shoulder. I grab his shoulder of his clothing. Bend him forward, slightly, and we pulled him out of the vehicle, together." He testified that they "weren't able to hold him up," and Robinson dropped to his knees and then

---

[2] Fox testified that he approached the vehicle because he believed that he had witnessed a hand-to-hand drug sale between Robinson and the woman.

to the ground.[3]

¶11.    Officers saw an abrasion on Robinson's forehead and, complying with JPD policy, called for an ambulance.  Paramedic Andrew Aycox with American Medical Response (AMR) testified that he responded to the scene that night, but the call was cancelled by police after the ambulance arrived.  He testified that the call came in at 7:43 p.m., and AMR arrived on the scene at 7:56 p.m.  His initial report indicated, "We cancelled on scene.  No patient contact.  No patient found by law enforcement."  However, he amended his report the following day when he learned that Robinson's "condition had changed."  Aycox testified that he was able to add a narrative to his report and tried to enter more information, such as his initial impression of Robinson, but was unable to do so because certain screens were locked due to the cancellation status of the call.  Aycox testified that despite the initial notation of "[n]o patient contact," he applied a small bandage to Robinson's forehead.  Aycox's amended report indicates that he observed an abrasion on the right side of Robinson's forehead "with bleeding controlled naturally," meaning it had stopped bleeding on its own before AMR arrived.  The bandage covering the abrasion was described as "a 4

---

[3] Lampley and the other eyewitness officers gave consistent testimony that Robinson appeared to be holding something in his hand that he was trying to get into his mouth and that Fox and Lampley were unable to position Robinson's arms behind his back to handcuff him because he was pulling his arms forward and bending his knees in an effort to drop to the ground.  Officers testified that once on the ground, Robinson slid his head on the pavement toward his hands, and it appeared to the officers that he put the object in his mouth.  The officers testified that at this point, Robinson stopped resisting arrest and allowed the officers to handcuff him.  The officers consistently testified that Robinson was not hit, kicked, stomped, or slammed into the pavement.  However, for purposes of our review, we examine this conflicting eyewitness testimony in the light most favorable to the State.

by 4 . . . folded in half, twice." Time records show AMR was on the scene for approximately five minutes. Aycox testified that Robinson, in terms of consciousness, was rated at a fifteen on the Glasgow Coma Scale, the highest rating for patient alertness.

¶12.    Fox cited Robinson for disobeying the commands of a law-enforcement officer and resisting arrest. Robinson was field-released.[4] No contraband or weapons were found in Robinson's car. According to Arnold, Fox then "told [Robinson] to leave," and Robinson got in his vehicle and drove away.

¶13.    Robinson drove to the Mustang Inn on Highway 80 in Jackson where his girlfriend, Constance Johnson, lived. Johnson testified that when Robinson walked in, he told her that JPD had "beat him up," and she saw a bloody bandage on his forehead. He lay down on the bed, and he and Johnson talked. Johnson then left to go to the store. When she returned, Robinson was lying on the bed, but he was not sleeping; "[h]e said he was okay." Johnson testified that about fifteen minutes after she returned from the store, "he started foaming at the mouth and starting shaking." She called 911.

¶14.    AMR personnel Krystopher Holman and Shawn McEwen were dispatched to the Mustang Inn at 11:13 p.m. When they arrived at 11:18 p.m., Robinson was lying face down on the bed, unconscious. Holman observed "some swelling up side his head" and "a little cut or scratch, maybe." Robinson's arms were tucked in front of him, and his legs were twisted inward, indicating decorticate posturing, which McEwen explained occurs due to

---

[4] Fox testified that he field-released Robinson with the approval of Fox's supervisor because the jail was not taking any misdemeanor inmates, "only felonies, shoplifting and domestics."

7

"involuntary muscle contractions" resulting from "some type of head injury." McEwen testified that this time, Robinson was rated at a six on the Glasgow Coma Scale.

¶15. Robinson was taken by ambulance to the University of Mississippi Medical Center (UMMC), where doctors discovered that he had a subdural hematoma, or collection of blood, on his brain and performed an emergency craniotomy to relieve the pressure. Robinson had a medical history of diabetes and hypertension and had recently been hospitalized from December 25-26, 2018, for stroke-like symptoms.

¶16. On the morning of January 14, 2019, Sergeant Scott Albrecht, Fox's supervisor, learned that a person arrested by JPD the previous night was in critical condition at UMMC. He went to UMMC and was told that the person was Robinson. Albrecht notified his commander, who instructed Fox, Lampley, and Barney to prepare use-of-force reports.

¶17. Robinson died the next day, on January 15, 2019. State Chief Medical Examiner Dr. Mark LeVaughn testified as to the results of the autopsy, which Dr. Brent Davis had performed. The autopsy report listed the cause of death as "at least three blunt injuries" to the head and the manner of death as homicide. Toxicology reports showed Robinson tested positive for marijuana and cocaine.

¶18. On August 4, 2020, Fox, Lampley, and Barney were indicted for the second-degree murder of Robinson. Lampley and Barney were jointly tried before Fox's trial. Fox's motion to consolidate his case with the other defendants was denied. At the end of the State's case-in-chief during Lampley and Barney's trial, the circuit court directed a verdict

8

in the defense's favor. Fox's case was assigned to a different judge and tried later.[5]

¶19. On August 5, 2022, a Hinds County Circuit Court jury found Fox guilty of the lesser-included offense of culpable-negligence manslaughter. He was sentenced to twenty years in the custody of the Mississippi Department of Corrections, with fifteen years suspended and five years to serve, followed by five years of supervised probation. The circuit court denied his post-trial motion for judgment notwithstanding the verdict or a new trial.

¶20. Fox raises five issues on appeal: he claims (1) the evidence was insufficient to support the verdict, and, alternatively, the verdict was against the overwhelming weight of the evidence; (2) the circuit court improperly refused a jury instruction on the defense of accident and misfortune; (3) the circuit court gave an improper jury instruction on a pre-existing physical condition; (4) jury instructions 14 and 20 were improper and denied Fox the right to a fair trial; and (5) the circuit court improperly gave an "aiding and abetting" or "acting in concert" instruction.

¶21. The State has confessed error on the first issue, conceding that the evidence was insufficient to support the verdict and that Fox's conviction should be reversed and rendered.[6] The Hinds County District Attorney's Office was granted leave to file a brief of

---

[5] The United States Attorney's Office for the Southern District of Mississippi declined to prosecute Fox, Lampley, or Barney after the Federal Bureau of Investigations investigated. Robinson's family filed a civil rights lawsuit against the City of Jackson, Fox, Lampley, Barney, and AMR in the United States District Court for the Southern District of Mississippi. *Wade v. City of Jackson*, 3:19-CV-897-CWR-FKB. On August 2, 2021, the district court dismissed the federal claims against Fox, Lampley, and Barney with prejudice on the basis that the officers were entitled to qualified immunity.

[6] We are not bound by the State's concession of error. *See McCollum v. State*, 186 So. 3d 948, 950 n.7 (Miss. Ct. App. 2016) (citing *White v. State*, 616 So. 2d 304, 307 (Miss.

amicus curiae opposing the State's concession, and the State was permitted to file a response. Finding reversible error as to issue one, and, alternatively, error as to issue two, we do not address Fox's remaining issues.

## DISCUSSION

### I. Sufficiency of the Evidence

¶22.    We review a trial court's ruling on the legal sufficiency of the evidence de novo. *Buchanan*, 316 So. 3d at 630 (¶49). "The test for sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the State and giving the State the benefit of all favorable inferences reasonably drawn from the evidence, any rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Chisholm v. State*, 365 So. 3d 229, 245 (¶66) (Miss. 2023). "[A]ll credible evidence [that] is consistent with guilt must be accepted as true . . . ." *Buchanan*, 316 So. 3d at 630 (¶49).

¶23.    The elements of the crime must be proved beyond a reasonable doubt by the evidence and not mere "guesswork, speculation and conjecture." *Edwards v. State*, 469 So. 2d 68, 69 (Miss. 1985). "[C]onviction in criminal cases must rest upon finite evidence and not probabilities or surmise." *Sisk v. State*, 294 So. 2d 472, 475 (Miss. 1974). "[I]f the facts and inferences favor the defendant with such force that reasonable jurors could not find him guilty beyond a reasonable doubt," the defendant's conviction must be reversed and rendered. *Melendez v. State*, 354 So. 3d 944, 952 (¶30) (Miss. Ct. App. 2023).

¶24.    "When the sufficiency of the evidence is challenged on appeal, this Court reviews the

1993)).

10

circuit court's ruling on the last occasion when the sufficiency of the evidence was challenged before the trial court." *Hodges v. State*, 743 So. 2d 319, 325 (¶36) (Miss. 1999). Fox last challenged the sufficiency of the evidence in his post-trial motion for judgment notwithstanding the verdict; therefore, "we will consider all of the evidence[,] not just that supporting the case for the prosecution." *Id.* at (¶38).

¶25. To prove the essential elements of culpable-negligence manslaughter by sufficient evidence, the State must show beyond a reasonable doubt the unlawful "killing of a human being, by the . . . culpable negligence of another . . . ." Miss. Code Ann. § 97-3-47 (Rev. 2014). Culpable negligence is defined as "such gross negligence . . . as to evince a wanton or reckless disregard for the safety of human life, or such an indifference to the consequences of an act under the surrounding circumstances as to render such conduct tantamount to willfulness." *Shumpert v. State*, 935 So. 2d 962, 967 (¶14) (Miss. 2006) (quoting *Evans v. State*, 562 So. 2d 91, 95 (Miss. 1990)). Stated differently, to find culpable negligence, the jury must determine that the defendant acted with "a flagrant and reckless disregard for the safety of others, or willful indifference to the injury liable to follow." *Id.* at 966 (¶9). "The only requirement is recklessness or a willful disregard for an unreasonable risk." *Id.* (citing *Campbell v. State*, 285 So. 2d 891, 893 (Miss. 1973)).

¶26. In criminal cases, culpable negligence requires a greater showing of gross negligence than in civil cases:

> [T]he term culpable negligence should be construed to mean a negligence of a higher degree than that which in civil cases is held to be gross negligence, and must be a negligence of a degree so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life, and that this

11

shall be so clearly evidenced as to place it beyond every reasonable doubt.

*Conley v. State*, 790 So. 2d 773, 793 (¶70) (Miss. 2001) (quoting *Grinnell v. State*, 230 So. 2d 555, 558 (Miss. 1970)). "Even in civil cases, a defendant is not liable for every consequence which may be remotely traced back to him but only for those which he should reasonably have foreseen as something likely to happen[—]not for those which might possibly happen but for those which under the circumstances so nearly approached a probability as to be characterized as likely to happen." *Brown v. State*, 304 So. 3d 692, 696 (¶16) (Miss. Ct. App. 2020) (quoting *Goudy v. State*, 203 Miss. 366, 369, 35 So. 2d 308, 309 (1948)).

¶27. The indictment charged that

> [Fox,] on, about and between the 13th day of January, 2019, and the 14th day of January, 2019, in [the First Judicial District of Hinds County,] . . . did willfully, unlawfully, and feloniously, without any premeditated design to effect the death of George Robinson, did kill George Robinson . . . without the authority of law by any means or in any manner during the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life . . . while serving as a City of Jackson Police Officer and/or while acting in concert and/or aiding, assisting or encouraging City of Jackson Police Officer Lincoln Chalmers Lampley and/or City of Jackson Police Officer Desmond Marcellous Barney, used physical force on George Robinson, causing George Robinson's death, which included physically removing him from his vehicle, slamming[7] George Robinson head first into the roadway pavement as well as striking and kicking George Robinson multiple times in the head and chest, all acts, whether occurring individually and/or cumulatively, that were eminently dangerous to George Robinson and evincing a depraved heart, regardless of human life, all occurring within the jurisdiction

---

[7] The indictment originally read "*body* slamming" rather than "slamming." (Emphasis added). Prior to trial, the circuit court granted the State's motion to amend the indictment to remove the word "body." The circuit court denied the State's motion to amend the indictment to remove the words "as well as striking and kicking George Robinson multiple times in the head and chest."

of this court and in violation of Section 97-3-19(l)(b), Mississippi Code Annotated (1972, as amended).

¶28. The jury was instructed that Fox was guilty of culpable-negligence manslaughter if he "[u]nlawfully and with culpable negligence killed George Robinson . . . [b]y using physical force on George Robinson to physically remove him from his vehicle, and slamming his head into the roadway pavement . . . ." The jury was also given the following instruction defining culpable negligence:

> Culpable negligence is negligence of a degree so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life. Negligence is doing something that a reasonably careful person would not do under similar circumstances or failing to do something that a reasonably careful person would do under similar circumstances.

> Depraved heart murder and culpable negligence manslaughter are distinguishable simply by the degree of mental state of culpability. In short, depraved heart murder involves a higher degree of recklessness from which malice may be implied.[8]

¶29. The prosecution presented testimony from two eyewitnesses that Robinson was slammed to the ground. Arnold testified that he saw Fox "snatch[] the door [of Robinson's car] open and grab[] him and throw him on the ground. . . . His head and . . . [h]is whole

---

[8] This Court has acknowledged that "[t]he distinction between depraved heart murder and culpable negligence manslaughter can be murky." *Steele v. State*, 852 So. 2d 78, 80 (¶10) (Miss. Ct. App. 2003). The second paragraph of this jury instruction tracks the Mississippi Supreme Court's "attempt at a most logical description of the relationship" in *Steele*:

> Depraved-heart murder and culpable-negligence manslaughter are distinguishable simply by degree of mental state of culpability. In short, depraved-heart murder involves a higher degree of recklessness from which malice or deliberate design may be implied.

*Id.* (quoting *Windham v. State*, 602 So. 2d 798, 801 (Miss. 1992)).

body" made contact with the ground; "[h]e hit it hard. He started bleeding . . . [from h]is head." Arnold further testified that once Robinson was on the ground, "Fox had his knee on [Robinson's] back and his arm on his shoulder, like, pushing his head up against the tire. His head was on the tire." When Robinson stood up, Arnold saw "blood . . coming from his head." Bolton testified that she saw Fox "snatch [Robinson] out [of the car] and then body slam[] him . . . and dip him and swung him on the ground." She testified that Robinson's "head hit the ground" and that the officer "raised his foot and stomped him" with his booted foot. After Robinson was back on his feet, she commented that "they really worked him over," and the police were "kicking people ass." She testified she could see Robinson standing next to the police SUV, and his "head was bleeding."

¶30. Fox asserts on appeal, and the State agrees, that the two eyewitnesses' testimonies described events that were "completely impossible based on the medical evidence." Fox and the State argue that the medical evidence showed that Robinson suffered no significant external injuries consistent with his being slammed to the pavement, and under the credible evidence presented at trial, a reasonable juror could not find Fox guilty of culpable-negligence manslaughter beyond a reasonable doubt. The medical evidence presented at trial is summarized as follows.

### A. Medical Evidence

#### 1. Dr. Mark LeVaughn

¶31. Chief Medical Examiner Dr. LeVaughn testified for the State as an expert witness to the autopsy results prepared by Dr. Brent Davis, who was no longer employed with the State

14

Medical Examiner's Office at the time of trial.

¶32.    Dr. LeVaughn testified that the photographs taken during the autopsy showed that Robinson suffered "three separate abrasions": "two above his right eye or his forehead and . . . one on the right side of his face, lateral, to his right eye."  He defined "abrasion" as "a superficial injury to the skin surface . . . caused by contact with an object."  He testified that there was also "swelling around the eye, itself."  Directly under the three abrasions, Dr. LeVaughn stated, there was "bruising or hemorrhage or contusion," and below that was a subdural hematoma, which was a complication of the injury and ultimate cause of Robinson's death.  Dr. LeVaughn described a second hemorrhage but stated that it was a result of the craniotomy that was performed while Robinson was still alive to alleviate the pressure on his brain.

¶33.    Dr. LeVaughn saw no evidence of traumatic injury to the chest, thoracic cavity, neck, or abdomen, and he found no broken bones and no bruising to the chest, shoulders, or back. Dr. LeVaughn testified that "[t]he toxicology showed a small amount of marijuana in his blood," but it "had nothing to, actually, do with his death."

¶34.    Based on the findings in the autopsy, Dr. LeVaughn concluded that Robinson's cause of death was "multiple blunt-head trauma" due to "blunt-force injury" and that the manner of death was homicide.

¶35.    He explained as follows regarding the finding of blunt-force trauma:

> Q.    Let's talk a little bit about your use of [the phrase] blunt force trauma. That blunt force trauma is, kind of, a scary sounding thing.  When I hear words like, homicide, blunt force trauma, I think I'm watching some crime television show.  But blunt force trauma is not a comment

15

on the amount of force, is it? It just means there's some force?

A.     No, I'm not trying to quantitate the amount of energy that occurred in the impact. I'm just saying that an impact occurred and it's not a sharp object. It's something blunt. That's all we're saying.

Q.     Which could be, if a child runs on the playground and skins his knee and there's an abrasion from it, that's going to be a blunt-force impact, correct?

A.     That is correct.

Q.     And that's going to be an abrasion; isn't it?

A.     If you see his injury, that's an abrasion, yes.

Q.     When you say that in your report that Mr. Robinson had multiple blood [sic] traumas, you're talking about the three abrasions?

A.     That's correct.

. . . .

Q.     In all fairness Dr. LeVaughn, to Detective Fox here, today, can we agree that based on everything you reviewed, Mr. Robinson was not a victim of any vicious assault, like, someone who had been beaten or kicked or having their head, intentionally slammed in the pavement; can we agree, based on that?

A.     I've testified in the past that *I never said that he was beaten or kicked or body slammed.*

Q.     *Or even slammed -- his head slammed in the roadway or pavement?*

A.     *I've never said that.*

(Emphasis added).

¶36.   When asked how much force was required to cause Robinson's injuries, Dr. LeVaughn testified that he could not make that determination to a reasonable degree of

16

medical certainty:

> Q. Are you able to determine, to a reasonable degree of medical certainty, how much force is required to cause these injuries?
>
> A. No, sir.
>
> Q. Do you know that it was enough force to cause the injury?
>
> A. Well, injuries are present, so some amount of force was necessary for an impact to his skin to cause the abrasions. And then, also, that under the abrasions, there was the hemorrhage. And then the complicating factor was the movement of the brain inside the skull, which caused those small veins to tear and that's what caused the bleeding or the subdural hemorrhage. But I can not tell you how much impact force was required to do that.

¶37. Dr. LeVaughn also testified that Robinson was taking the blood thinner Plavix and aspirin and that he was hypertensive, making him more susceptible to bruising and bleeding upon a minor impact. He explained:

> Q. And the sequence of events is, that you believe happen, is that there -- whatever happened on the scene at the Jones Avenue, where there was an interaction with police, said that impact that caused the abrasions, set in motion, a series of events because he had certain pre-existing conditions that made him more susceptible to the bleeding; and that, ultimately, lead through a process of a subdural hemorrhage; is that correct?
>
> A. That's correct.
>
> Q. But it didn't have to take any kind of violent impact to start that process, did it?
>
> A. Not necessarily, no.
>
> Q. *In this case, you're not saying that there was any type of a violent impact?*
>
> A. *I am not.*

17

Q.    You're not saying that there was anything that -- as a matter of fact, you aren't testifying to the fact that there was no evidence of a violent beating or anything like that; is that correct?

A.    My previous testimony was that *there was no evidence of being beaten or kicked or body slammed.*

Q.    You said earlier, on direct, you can't say if his head was slammed into the ground, correct?

A.    *I want to remove the slam and use impact.*

Q.    *Because the only, visible injury, was abrasions?*

A.    *That's correct.*

Q.    And those abrasions are the type of injury we normally, expect to see, from a fairly minor impact; is that correct?

A.    *The appearance of the abrasion is a minor type of injury.*

Q.    And, unfortunately, in this case, that minor injury, because of issues that . . . Detective Fox and the other Officers had on the scene, AMR, they didn't know about; that is what, ultimately, lead to his death; is that correct?

A.    All I'm saying is the impact caused a sequence of events that lead to his death.  And there was, obviously, a contributing factor, which was the anti-coagulant.

(Emphasis added).

¶38.    Dr. LeVaughn testified that a subdural hemorrhage is "bleeding on the surface of the brain" and can be developed from a very severe or very minor trauma, or it can develop spontaneously. Regarding whether excessive force was used by law enforcement causing the subdural hemorrhage, Dr. LeVaughn testified that the presence of a subdural hemorrhage does not, in and of itself, mean that excessive force was used:

18

Q.      And the fact that Mr. Robinson had a subdural hemorrhaging that does not mean that he was beaten up or attacked or viciously assaulted by anybody?

A.      I've never stated that he was beaten viciously or assaulted. I just diagnosed, blunt-head injury.

Q.      And the fact that Mr. Robinson had a subdural hematoma does not mean that any police officer used any excessive force?

A.      That's correct.

¶39.    Regarding the classification of Robinson's death as a homicide, Dr. LeVaughn stated that the term homicide is used whenever there is "evidence that there was an interaction with [an]other person or persons." Dr. LeVaughn cited the coroner's report that Robinson had been assaulted but admitted he did not "know, specifically, what happened" on the scene. However, he explained that the classification of the death as a homicide is not a legal conclusion that a crime or criminal act occurred.

## 2.      Dr. Timothy Usee

¶40.    Defense witness Dr. Timothy Usee was recognized as an expert in diagnostic vascular interventional radiology. He was employed as a physician at Baptist Golden Triangle in Columbus, Mississippi. He testified that he "very regularly" diagnosed subdural hematomas in patients and "[v]ery frequently" diagnosed traumatic injuries. He testified that in his experience, when a patient is on Plavix and comes to the hospital's emergency department with any complaint related to the brain or an abnormal level of consciousness, "the indication says you need a head CT because a substantial number of subdural hematomas are associated with no recognized or documented trauma of any kind."

19

¶41.   He testified that after Robinson was admitted to the hospital on the evening of January 13, 2019, a CT scan was taken "from the top of his head to the top of his thighs." He called the CT scan the "gold standard" for diagnosing hemorrhages, and, in this particular case, it was "the only accurate picture we have of Mr. Robinson and his body prior to the surgery on his brain [(the craniotomy)]." Dr. Usee was asked, "[I]n your opinion, what physical injuries did Mr. Robinson sustain during his interaction with the police?" He responded, "Based on the CT, which, was the only picture of him, after that incident, they were relatively minor."

¶42.   Dr. Usee testified that the CT scan showed a "small contusion" and swelling over Robinson's right eye, which he described as "relatively mild superficial injuries." The CT scan revealed no fracture to the "thin bones" of the face, which he testified do not "take much to break," and no fractures to any other bones.[9] No evidence of bruising under the skin existed. Rather, "the CT findings outside the brain were all normal, completely normal."

¶43.   Dr. Usee testified that the brain contusion that was described in the autopsy report was not present on the CT scan taken when Robinson was admitted to the hospital. Rather, in his opinion, several of the injuries described in the autopsy report occurred during the craniotomy. He stated:

> Q.      . . . The autopsy report contains some findings in the brain, like, basal
>          ganglia hemorrhage and contusion and a different kind of hemorrhage,

---

[9] The medical records show that a radiologist noted a rib fracture on the results of the CT scan. However, Dr. Usee testified that this was a misread and that the images of the ribs from the CT scan were "as clear as day and there's no fracture." Dr. Usee testified that if a rib had been fractured, there would be a clear line on the rib and bleeding, neither of which were present on the CT scan or autopsy report. The radiologist who diagnosed the rib fracture was not called to testify; nor is there any indication he or she was deposed or otherwise testified in any capacity under oath.

subarachnoid hemorrhage, did you see those?

A.    No.

. . . .

Q.    Do you have an opinion as to whether those were present at the time the CT was done, before the craniotomy on January 14th 2019?

A.    Absolutely.  And then none of them -- the only hemorrhage that was present on the CT, and remember, CT is the diagnostic, it is the gold standard for the detection of intercranial hemorrhage and the different kinds -- and the different kinds, kind of, tell you, maybe what the cause is and outline treatment courses. In this particular case, there was subdural hemorrhage.  There was absolutely no contusion on the brain. We see that very well.  There was no basal ganglia hemorrhage and there was no subarachnoid hemorrhage on that CT that was performed prior to surgery.

Q.    And the fact that it wasn't there, what does that tell you?

A.    It tells me, unequivocally, that it was the result of the surgery he had. Which is a major surgery, as you can see, by the skin staples. I mean, they cut your scalp open and they take a saw and cut out a large part of your skull to open it up and it causes trauma.

¶44.    When asked if it was "possible" that the trauma that caused the abrasion also caused the subdural hemorrhage, Dr. Usee responded, "Based on a minor trauma, a patient on Plavix, yeah.  Having a minimal trauma, bumping your head, I'd have to say that's very possible."  However, he stated that if Robinson were slammed to the ground, he would have expected to see much greater injuries:

Frankly, a man of his size, I would expect fractures of his face, especially, given the size and the superficial location of the bones in that area.  I would expect a lot more soft tissue injury than I'm seeing on the autopsy pictures and on the CT.  And if you were truly slammed -- and there's other issues.  You can bleed a lot other places besides your brain, if you're on Plavix and you have a sufficient trauma.

21

¶45. Dr. Usee also explained that Robinson had other risk factors in addition to the use of Plavix that could cause him to bleed more easily than a person without those risk factors:

> [H]e was taking, what we call, dual anti-platelet medications. Aspirin, which is -- inhibits platelets, too; not to the same degree as Plavix, but it does enhance the effect. So, you've got two; one very powerful anti-platelet medication and another supplemental. His age, he was also a Diabetic, put you at risk. Hypertension. Those are all -- hypertension and diabetes cause all sorts of damage, at a very small level, to blood vessels in your brain and anywhere else in your body.

He further testified that using a stimulant drug can increase the risk of intercranial bleeding because stimulant use increases hypertension, which in turn "can cause very profound increases in blood pressure, . . . the pressure within the blood vessel, so you get damaged blood vessels so the rupture is less likely to clot because of the pressure."

### 3. Dr. Jonathan Arden

¶46. Dr. Jonathan Arden testified for the defense as an expert in forensic and anatomical pathology. He opined that Robinson's death was incorrectly classified as a homicide because there was "a great degree of uncertainty of when he received his injury, whether he received more than one injury and how it happened." He testified that Robinson's injuries were not consistent with a person "being body slammed, head first, into the pavement" because

> [t]hat kind of activity of slamming the face in to a hard surface, would have caused a much greater degree of bruising, which, we didn't see. Probably would have caused more scraping that we didn't see. Very likely, would have caused, what's called a laceration, which is when the tissue splits open. . . . He didn't have any. Facial fractures would be likely. He didn't have any.

He further testified that no injuries were present consistent with Robinson's being punched, kicked, or stomped in his head or chest, and if he "had sustained those kinds of injuries, he

22

would have bled or bruised more severely than your average person" due to being on Plavix.

¶47.　Dr. Arden was specifically asked whether it was "possible" that Robinson sustained the abrasions to his forehead as a result of "being taken forcefully, face first, to the pavement." He answered, "[I]s it possible, yes," but "I don't base opinions on possibles. You need probables," and it was not "probable" in his opinion. Rather, in his opinion, based on the injuries seen, the time line of events, and the fact that Robinson was "still up and moving" for a time period after the arrest, he could not say "to a reasonable degree of medical certainty that the interaction with the officers, definitively, did cause a subdural hematoma."

### 4.　Dr. George Russell

¶48.　Dr. George Russell testified for the defense as an expert in orthopedic and trauma surgery. He was employed as a physician at UMMC. He testified that the injuries presented were "minor," "superficial abrasions." He found that the injuries were "not consistent with being body slammed, head first, into the pavement." Other than the abrasions, "[t]here was no other trauma to any other part of the body." Dr. Russell testified that the toxicology report was positive for cocaine and THC, a component of marijuana.

### B.　Elements of Culpable-Negligence Manslaughter

¶49.　Under the culpable-negligence manslaughter instruction given to the jury, the jury was required to find beyond a reasonable doubt by the credible evidence that Fox "[u]nlawfully and with culpable negligence killed George Robinson . . . [b]y using physical force on George Robinson to physically remove him from his vehicle, and *slamming his head into the*

23

*roadway pavement . . . .*"  (Emphasis added).

¶50.  A conviction of culpable-negligence manslaughter can only stand if sufficient *credible evidence* shows beyond a reasonable doubt that the defendant acted in such a grossly negligent manner as to show a wanton disregard or utter indifference to the safety of human life.  *Brown*, 304 So. 3d at 696 (¶17).  Black's Law Dictionary defines "credible evidence" as "[e]vidence that is worthy of belief; trustworthy evidence."  *Evidence*, Black's Law Dictionary (11th ed. 2019).

¶51.  Given the testimony from the State's medical expert and the defense's three medical experts, we cannot find that the credible evidence supports a finding that Fox "slammed," "stomped," or otherwise took any action that demonstrated "negligence of a degree so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of [Robinson's] life."  *Brown*, 304 So. 3d at 697 (¶22).  In coming to this conclusion, we do not reweigh the evidence.  We recognize that the jury is the fact-finder, and we must view the evidence in the light most favorable to the prosecution and accept all credibility determinations and reasonable inferences in the evidence in the prosecution's favor.  We do not consider whether we believe the jury's decision is correct.  Rather, we look at the *credible* evidence to determine whether the jury made a *rational* decision that the elements of the crime were proven at trial beyond a reasonable doubt.  While we take the evidence in the light most favorable to the prosecution, we are not required to ignore the defense's evidence or accept incredible testimony as true.  *Hodges*, 743 So. 2d at 325 (¶38).  If a witness's testimony necessary to support the jury's verdict "is so implausible or so

substantially impeached as to be unworthy of belief," it is not required to be credited by this Court. *Jones v. State*, 281 So. 3d 137, 147 (¶27) (Miss. Ct. App. 2019).

¶52. All medical experts at trial agreed that Robinson's injuries were "minor" and "superficial" and not consistent with someone who was slammed to the ground. During its examination of State medical witness Dr. LeVaughn, the prosecution repeatedly tried to elicit testimony that Robinson's injuries resulted from his being thrown to the ground, but Dr. LeVaughn remained resolute in his testimony that such a conclusion was not supported by the autopsy report. When asked if the autopsy revealed injuries consistent with Robinson's "head [being] slammed in the roadway or pavement," Dr. LeVaughn responded, "I've never said that." Rather, he testified that "there was no evidence of being beaten or kicked or body slammed." While he found that the injuries were consistent with an "impact" to the pavement, he described the abrasions that resulted from the impact as "minor" and "superficial." Further, Dr. LeVaughn testified that he could not give the opinion that the presence of a subdural hemorrhage, in and of itself, necessarily meant that excessive force was used. All experts agreed that there was no bruising, broken bones, bleeding, or any other type of physical injury to any other part of the body.

¶53. Without any credible evidence that Fox acted unreasonably or used unreasonable force, it follows that a rational person could not conclude that Robinson's death was a foreseeable result of Fox's actions. Under our culpable-negligence standard, the victim's death must be a foreseeable result of the defendant's actions because, even in civil negligence cases, foreseeability is a required element. "Actionable fault on the part of a

25

defendant must be predicated on *action or nonaction accompanied by knowledge* actual or implied of the facts which make the result of his conduct *not only a probable result* but a result also which he should, in view of these facts, have *reasonably anticipated*." *Jabron v. State*, 172 Miss. 135, 140, 159 So. 406, 407 (1935) (emphasis added) (reversing and rendering the defendant's culpable-negligence manslaughter conviction where the medical testimony established only a "possibility," rather than a "probability," that defendant's actions caused the victim's death).

¶54.   Here, when questioned on cross-examination, Dr. Usee admitted that it was "possible"—but not "probable"—that Robinson sustained the abrasions to his forehead as a result of "being taken forcefully, face first, to the pavement." He testified, "I don't base opinions on possibles. You need probables," and it was not "probable" that a person would suffer only a minor abrasion from being forcefully thrown to the ground. The evidence does not support a finding, beyond a reasonable doubt, that Fox should have known that Robinson's death was a probable result that he should have reasonably anticipated.

¶55.   Fox and the State agree that this Court's decision in *Brown v. State*, 304 So. 3d 692 (Miss. Ct. App. 2020), is controlling. In *Brown*, this Court reversed and rendered a culpable-negligence manslaughter conviction due to lack of sufficient evidence. *Id.* at 697 (¶22). While Terrance Brown was working as a security guard at Antonio's Bar & Grill, a fight broke out between two patrons. *Id.* at 694 (¶2). A third patron, Tevin Quiney, intervened and attempted to remove one of the men involved from the bar. Brown responded by attempting to remove Quiney from the bar. In the process, Quiney, who was five feet, eight

26

inches tall and 367 pounds, fell unconscious. *Id.* at (¶¶2-3). Brown began to perform CPR but was unable to revive Quiney. Quiney was transported by ambulance to a nearby hospital where he died. *Id.* at (¶3). His "cause of death was determined to be complications of hypertensive cardiovascular disease associated with a physical altercation." *Id.* at (¶7).

¶56.    At trial, Quiney's friend who was present at the bar testified that he saw Brown "wrap[] his arms around Quiney's neck and 'choke[] him to the ground.'" *Id.* at (¶4). Another eyewitness, who was "close enough to touch," testified that "he was 'positive' he did not see Brown choke Quiney." *Id.* at (¶6). This eyewitness stated that Quiney's behavior was "kind of hostile" and that when Brown attempted to remove him from the dance floor, Quiney acted as if he "wanted to tussle or whatever." Quiney "looked like he wanted to hit [Brown] or, you know, swing or something, so Terrance Brown brought him to the floor and he was trying to handcuff him" at the time when Quiney lost consciousness. *Id.*

¶57.    The autopsy showed that Quiney's manner of death was homicide. The State Chief Medical Examiner Dr. LeVaughn testified that the autopsy revealed "a number of small bruises and lacerations on [Quiney's] face in addition to petechia (redness in the eye)." *Id.* at (¶8). Regarding any injuries to his neck that may have occurred based on the eyewitness testimony that Quiney was "choke[d] . . . to the ground," Dr. LeVaughn testified that there was no sign of "any crushing of the larynx" or injury to "any structures of the neck[.]" "[T]he only injuries found near the neck were a 'scrape to the chin' and 'injuries to . . . the lip.'" *Id.* Dr. LeVaughn testified on cross-examination that these injuries "could have been caused by medical procedures such as intubation" and "that the redness in the eye could have

27

been caused by choking or other possibilities such as 'any sustained pressure on the neck; any sustained pressure on the chest[,]'" including "from having received CPR" or from a "disease of a clotting or bleeding." *Id.* at 694-95 (¶9).

¶58. On appeal, Brown argued that the evidence was insufficient to sustain the culpable-negligence-manslaughter verdict or, alternatively, that the verdict was contrary to the weight of the evidence. *Id.* at (¶11). This Court concluded that "Brown's singular act of attempting to remove Quiney from the bar" did not rise to the level of "negligence of a degree so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life" and, thus, was insufficient to establish culpable-negligence manslaughter. *Id.* at 697 (¶22). Accordingly, we reversed and rendered Brown's conviction.

¶59. In its amicus brief, the District Attorney asserts that *Brown* is not controlling and that Fox and the State misapprehend and misapply its holding. The dissent agrees with the District Attorney's position. The District Attorney argues that *Brown* is inapplicable because it "pertain[s] to the *causal relationship* between the defendant's actions and the cause of the victim's death, where the medical cause of death is a *collateral result* of the defendant's actions . . . ." (Emphasis added). In the District Attorney's view, this Court found insufficient evidence to sustain Brown's conviction because there was no "causal relationship" between Brown's single act of attempting to remove Quiney from the bar and Quiney's death by "collateral" complications of hypertensive cardiovascular disease. The District Attorney contends that Fox's case is distinguishable because Robinson's "cause of death [(blunt-force trauma)] was directly related to his injuries" from being "slammed into

28

asphalt head first," and there is consequently no need to consider whether a "collateral comorbid condition" caused the victim's death.

¶60.    Fox and the State respond that the District Attorney's argument misconstrues the crux of the holding in *Brown*.  They argue that the holding in *Brown* did not turn on whether the victim died as a result of a comorbid condition or even whether the victim died as a direct result of Brown's actions.  Rather, as the State puts it, the issue in *Brown* "was whether the evidence allowed a rational juror to conclude that the defendant *acted with the culpability needed to convict . . . .*"  (Emphasis added).  In other words, as the State correctly explains, the decision turned on "whether the defendant was doing something so grievous that he should have reasonably foreseen that his conduct was likely to cause death."  Fox reiterates that to believe the District Attorney's argument that Fox acted in such a grievous manner as to rise to culpable negligence, one must ignore the testimony of all four medical experts that there was no evidence of trauma consistent with Robinson's being slammed into the pavement headfirst, and one must also ignore the undisputed evidence that Robinson had comorbid conditions, such as hypertension and the use of blood thinners, unknown to Fox and the other officers, which would make his death resulting from a minor abrasion unforeseeable.

¶61.    As the parties acknowledge, we are presented with a conflicting version of events regarding Fox's actions.  On the one hand, two eyewitnesses testified that they saw Fox throw, slam, and kick Robinson.  On the other hand, the medical testimony showed that Robinson suffered no injuries consistent with being thrown, slammed, or kicked.  Even Dr.

LeVaughn, the prosecution's own expert, testified that he could not find evidence of any type of violent impact and that there was no evidence that Robinson was beaten, kicked, or body slammed. Rather, he found that Robinson suffered some sort of "impact" that caused "abrasions" but that it was a "minor type of injury." Dr. Usee added that if Robinson had been slammed to the ground, he would have expected to see "fractures of his face, especially, given the size and the superficial location of the bones in that area" and "a lot more soft tissue injury."

¶62. The question is whether this conflicting evidence goes to the sufficiency or weight of the evidence. It is well established that in reviewing both the sufficiency and weight of the evidence, "[t]he jury is the ultimate trier of fact" and resolves issues regarding the weight and credibility of witnesses. *Clanton v. State*, 365 So. 3d 203, 217 (¶56) (Miss. 2023). We find that the issue here is not the weight of the evidence but the sufficiency of the evidence. In this case, we cannot consider the testimony of the eyewitnesses in isolation and ignore the medical testimony. They must be considered together because a conviction in this case cannot be sustained without testimony as to the cause of death. While the eyewitnesses can testify to what they saw, their testimonies alone are insufficient to establish the cause of death. The medical testimony was essential to establish the victim's cause of death, and we cannot ignore that the medical testimony of the four doctors entirely undermines the severity of Fox's actions that the eyewitnesses say they saw. Taking the testimonies together, we find that the eyewitnesses' testimonies were not credible and cannot form the basis for Fox's conviction. *See Sisk*, 294 So. 2d at 475 (A "conviction in criminal cases must rest upon finite

30

evidence and not probabilities or surmise."). Under the unique circumstances of this case, we find no credible evidence sufficient for a reasonable jury to find the elements of culpable-negligence manslaughter beyond a reasonable doubt.

¶63. In *Shirley v. State*, 942 So. 2d 322, 326 (¶10) (Miss. Ct. App. 2006), this Court affirmed a culpable-negligence manslaughter conviction where the victim "died of subdural hemorrhaging and major bruising to the brain," and the cause of death was "cranial cerebral trauma, secondary to blunt force trauma." The evidence showed that Shirley and the victim got into a fight, and Shirley punched the victim several times. *Id.* The base of the victim's skull and bone around his left eye were fractured. *Id.* There was testimony that the victim had no defensive wounds and that Shirley had an opportunity to walk away from the fight but "would not back down." *Id.* at 328 (¶¶21-22). We found the evidence was sufficient to support the finding that Shirley acted with such gross negligence to evince a wanton or reckless disregard for the safety of human life. *Id.* at (¶22).

¶64. Here, unlike the defendant in *Shirley*, no credible evidence established that Fox acted with "a flagrant and reckless disregard for the safety of others, or willful indifference to the injury liable to follow" or a "willful disregard for an unreasonable risk." *Shumpert*, 935 So. 2d at 966-67 (¶¶9, 14). Rather, the testimony showed that Fox and the other officers removed Robinson from his vehicle and placed him under arrest, and Robinson did not sustain any serious injuries consistent with Fox's slamming him to the ground, as charged in the indictment. Rather, he sustained a minor, superficial abrasion on his forehead that was able to be covered by a four-by-four bandage folded in half twice.

31

¶65. Further, no evidence showed that Fox should have reasonably foreseen that a minor abrasion to Robinson's forehead could have caused his death. No evidence was presented that Fox or the other officers knew that Robinson was taking blood thinners, was hypertensive, or was on a stimulant (cocaine), all of which could cause him to bleed more easily than normal. After a thorough review of the record, we conclude that the inferences drawn from the evidence "favor the defendant with such force that reasonable jurors could not find him guilty beyond a reasonable doubt," and, thus, the evidence was insufficient to support the verdict. *Melendez*, 354 So. 3d at 952 (¶30).

¶66. The dissent finds that sufficient evidence existed because the jury, as fact finders, could have chosen to believe Arnold's and Bolton's "description of Robinson being 'body slammed' to the ground and his head hitting the pavement hard and starting to bleed" even though their version of events was not supported by the medical testimony. *See Willis v. State*, 300 So. 3d 999, 1007 (¶25) (Miss. 2020) (stating that the jury must assess witness credibility and resolve conflicts in evidence). The dissent states, "We cannot discard the testimony of an eyewitness because *we* find the expert medical testimony to be more credible." We agree that taken as true, Arnold's and Bolton's testimonies *standing alone* were sufficient to sustain the jury's finding that an injury occurred. Their testimony certainly described an attack that exhibited behavior that a reasonable jury could find was "so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life," rising to the level of culpable negligence. *Conley*, 790 So. 2d at 793 (¶70). The issue, however, is that their testimonies cannot be taken alone because the prosecution was required

32

to prove Fox's conduct was the foreseeable cause of Robinson's death. Clearly, as stated in the elements jury instruction, to find Fox guilty of culpable-negligence manslaughter, the prosecution was required to prove Fox's actions "killed George Robinson." Thus, the cause of death was an essential element of the crime. Arnold's and Bolton's testimonies were insufficient to prove the cause of death. Rather, the cause of death was required to be proven beyond a reasonable doubt through medical expert testimony. Consequently, we cannot disregard the medical testimony, as the dissent contends we must do. As described in detail above, no medical testimony was presented that supported a violent attack on Robinson. As stated by the prosecution's own medical expert, "there was no evidence of being beaten or kicked or body slammed," facts that were essential to find Fox guilty under the jury instructions.

¶67. The dissent further finds that the jury could have convicted Fox if it believed that Fox used "any force" against Robinson while acting unlawfully and in violation of the Fourth Amendment. The dissent reasons that if the jury found Fox lacked reasonable suspicion to detain Robinson and thus acted unlawfully in detaining Robinson, then "*any force* that [Fox] used would be unreasonable." (Emphasis added). First, no party raised this theory at trial or on appeal. To the contrary, the District Attorney at trial and in the amicus brief repeatedly reiterates that the prosecution's theory of the case was that a violent attack occurred leading to Robinson's death. In closing arguments at trial, the prosecutor stated:

> They opened the [car] door. They, *forcefully, grabbed him out*. The man is saying, I just had a stroke. I'm moving slow. He's 62-years old. He's 5'7, 270 pounds and they *yanked him, forcefully, from the car*. They *take him to the ground. Slammed him down*. His head hits the payment.

33

. . . .

> *George was getting his behind kicked*, by this lion, and the people assisting him. That's what was going on.

(Emphasis added). The District Attorney's amicus brief states:

> [T]he evidence at trial, when viewed in the light most favorable to the verdict, revealed that the defendant, while conducting field interviews in pursuit of a juvenile murder suspect, *forcibly removed* a 62-year-old, partially paralyzed stroke survivor from a vehicle, without legal authority, *and slammed him head-first into concreate* . . . .

(Emphasis added). The amicus brief does not assert any argument under the Fourth Amendment. "It is the immutable obligation of a court to sit, and to sit only, as an objective and indifferent arbiter of the rights of the litigants. To place upon ourselves as justices and judges a duty to scour the record in order to discover potential error where none was suggested at any point by any party would be to put the Court in a position too closely resembling that of a[n] interested litigant, and that we shall not do." *Flynt v. State*, 183 So. 3d 1, 14 (¶42) (Miss. 2015) (citation omitted). Our objectivity would be equally suspect were we to posit ways to affirm that no party has suggested.

¶68. Not only is the dissent's theory not before this Court for review, it is outside the scope of the indictment and contrary to the jury instructions given at trial. The indictment charged that Fox, alone or acting in concert with the other officers, used "physical force" on Robinson, "includ[ing] *physically removing him from his vehicle, slamming* George Robinson head first into the roadway pavement *as well as striking and kicking George Robinson multiple times* in the head and chest . . . ." On the first day of trial, the prosecution moved to amend the indictment to remove the word "body," which appeared before the word

34

"slamming," and to remove the phrase "as well as striking and kicking George Robinson multiple times in the head and chest." On appeal, Fox asserts that "[i]t is not hard to surmise that the prosecutors [made this motion because they] became aware that <u>none</u> of the medical evidence supported any of the allegations made in the Indictment." The circuit court allowed the removal of the word "body" but otherwise denied the motion, finding the remaining proposed amendment substantive. The judge explained, "I'm not going to allow the description of what happened to the decedent to be removed. Essentially, that's what Mr. Fox was indicted for and that's what the State's responsibility would be to prove to the jury . . . ." The circuit court's ruling on the motion to amend has not been challenged on appeal. Therefore, we must take the indictment as written.

¶69. Consistent with the indictment, the elements instruction on culpable-negligence manslaughter required the jury to find *beyond a reasonable doubt*—regardless of whether Fox detained Robinson lawfully or unlawfully—that he "killed George Robinson . . . [*b*]*y using physical force* on George Robinson to *physically remove him from his vehicle, and slamming his head into the roadway pavement* . . . ." (Emphasis added). To "slam" is to "push or put somewhere with great force." *Slam*, New Oxford American Dictionary 1640 (3d ed. 2010). Saying that the jury could have found Fox guilty if he used "any force" in conjunction with violating the Fourth Amendment is contrary to the indictment and jury instructions and, according to the circuit court's ruling, would have unfairly prejudiced Fox's defense at trial.

¶70. In this vein, the dissent contends that "[t]he amount of force [that Fox used] . . . is not

35

the issue here." We disagree. Again, to prove culpable-negligence manslaughter, the State was required to show beyond a reasonable doubt that Fox acted with "such gross negligence . . . as to evince a wanton or reckless disregard for the safety of human life, or such an indifference to the consequences of an act under the surrounding circumstances as to render such conduct tantamount to willfulness." *Shumpert*, 935 So. 2d at 967 (¶14). The use of minor force would not meet this high standard in this case even if Robinson were vulnerable because of his pre-existing medical conditions.

¶71. While jury instructions 17 and 20 addressed how the jury was to proceed if it found that Fox unlawfully detained Robinson, these jury instructions did not alter the prosecution's burden to prove the charges in the indictment. The dissent relies on jury instruction 17, which instructed the jury that if it found that Fox lacked reasonable suspicion to detain Robinson, then his command for Robinson to exit the vehicle was unlawful, and it was consequently "lawful for George Robinson to resist that command." Then, jury instruction 20 stated:

> An officer attempting to make an unlawful arrest *is simply the aggressor in the difficulty*, and stands in the shoes of any aggressor in a like difficulty. And is in no worse attitude than any other aggressor under like facts and circumstances.

(Emphasis added).

¶72. Under these instructions, even if the jury determined that Fox acted unlawfully, the jury was simply to consider him the aggressor in the altercation and acknowledge Robinson's right to resist unlawful commands. Neither jury instruction diminished the jury's responsibility to find each element of culpable-negligence manslaughter beyond a reasonable

doubt. Therefore, there is no support for the dissent's position that a finding of a Fourth Amendment violation would have somehow diminished the State's burden of proving the facts as set out in the indictment and jury instructions.

¶73. In *Brown*, we noted a decision our supreme court issued over forty years ago expressing concern with the level of proof required to sustain a conviction of culpable-negligence manslaughter. *Brown*, 304 So. 3d at 697 (¶21). The court explained: "Experience has shown that under [the culpable-negligence statute] juries are overinclined to convict on proof of what is in fact no more than simple negligence, and as a result there have been more reversals in this class of cases than perhaps in any other that comes before us." *Id.* (quoting *Phillips v. State*, 379 So. 2d 318, 320 (Miss. 1980)).

¶74. We conclude that the evidence is insufficient to support the verdict. Fox's conviction of culpable-negligence manslaughter is reversed and rendered.

## II. Accident Jury Instruction

¶75. Alternatively, if we were not to reverse and render for lack of sufficient evidence, we would reverse and remand for a new trial based on the failure to give an accident or misfortune jury instruction.[10]

¶76. This Court reviews the giving or refusal of a jury instruction for abuse of discretion. *Anderson v. State*, 359 So. 3d 637, 641 (¶17) (Miss. 2023). The instructions must be read

---

[10] We also alternatively find that the verdict was against the overwhelming weight of the evidence. *Burden v. State*, 347 So. 3d 174, 178 (¶15) (Miss. 2022) (A jury's verdict must be reversed and a new trial granted if the verdict is "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." (quoting *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017))).

as a whole to determine whether the jury was properly instructed. *Id.* "If the instructions as a whole 'fairly state the law of the case and create no injustice,' this Court will not reverse." *Id.* (quoting *Bailey v. State*, 78 So. 3d 308, 315 (¶20) (Miss. 2012)). While "a defendant is entitled to have jury instructions given which present his theory of the case," the instructions must (1) correctly state the law, (2) not be covered fairly elsewhere in the instructions, and (3) have foundation in the evidence. *Id.* at 641-42 (¶17).

¶77. Fox argues that the trial court abused its discretion by refusing an accident or misfortune jury instruction based on the conclusion that no testimony "indicated that the acts performed by the defendant were of an accidental nature or as a result of some type of misfortune." He argues that no other instruction covered his theory of defense that Robinson was injured by accident or misfortune while Fox used lawful means to remove him from his vehicle. The State did not respond to this issue on appeal, nor did the District Attorney address the issue in the amicus brief. The failure to respond to an issue on appeal "is tantamount to confession" of the error alleged by the appellant. *Chatman v. State*, 761 So. 2d 851, 854 (¶9) (Miss. 2000).

¶78. Proposed jury instruction D-9 states:

> The Court instructs the jury that if George Robinson's death was a result of an accident or misfortune while Anthony Fox was engaged in a lawful act by lawful means, with usual and ordinary caution, and without unlawful intent, then you shall find the Defendant, Anthony Fox, "not guilty" and you shall return your verdict as follows: "We, the Jury, find the Defendant, Anthony Fox, not guilty."

¶79. First, the proposed jury instruction is a correct statement of law. It tracks the language of Mississippi Code Annotated section 97-3-17(a) (Rev. 2014), which provides that "[t]he

killing of any human being by the act, procurement, or omission of another shall be excusable . . . [w]hen committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent . . . ."

¶80.    Second, the instruction is not fairly covered elsewhere, as it was the only proposed instruction on accident and misfortune.  The third and final consideration is whether the instruction was supported by the evidence.

¶81.    Fox testified that he approached Robinson after he observed what he thought to be an unlawful hand-to-hand drug sale between a woman and Robinson, whom Fox had previously arrested for drug possession.  Fox and multiple other police officers testified that Fox repeatedly instructed Robinson to show his hands and exit the vehicle, but Robinson failed to comply and instead reached toward the center of the vehicle.  This encounter occurred at night in a neighborhood Fox knew to be a high-crime area.  Fox testified that fearing that Robinson was reaching for a weapon, he proceeded to remove Robinson from the vehicle for his safety and the safety of the other officers.  Once removed from the vehicle, Fox and Lampley tried to handcuff Robinson, but Robinson intentionally resisted arrest.

¶82.    Officer Moore, who was standing outside his patrol car twenty-five to thirty feet away, described the scene as follows:

> And as they got him out, . . . it was a four-door sedan, I think . . . [w]hich was, relatively close, to the ground.  And as they pulled him out, he, kind of, came out on his knees, but he still had his hands here.  And by that time, I think, one of the officers worked their way around to his right side and they were, actively, trying to, you know, pull his hands out to put him in the cuffs or . . . to, you know, eliminate that threat, maybe, about, him having a weapon.
>
> . . . .

39

[O]nce they got him out of the vehicle, he had his hands and arms clutched close to his body. And it appeared that he was, just, kind of, weighing himself down to get more, I guess, leverage from them, trying to pry his arms away. And it appeared to me that they couldn't pry his arms away, so, they just, kind of, let him down on the ground. And, like I said, when he fell down, his arms and hands were still tucked up under his body. And they were still, actively trying, to, you know, get his arms and hands away from up under his body.

. . . .

[H]e was, you know, back and forth, rubbing, kind of, working his hands up towards his face.

. . . .

At that time, he finally worked his hands up close to his head and he was, kind of, like, going back and forth on the ground, you know, just, kind of, working his hands up. And that's when I notified the other officers that were trying to get his arms and his hands, I said, hey, looks like he's putting something in his mouth. So, by that time, he kind of, popped something in his mouth. I don't know what it is, at that time, but -- at that time, once he put whatever it was in his mouth, he, just, kind of, let go and let the officer place him in his handcuffs.

¶83. None of the officers testified that Robinson was hit, kicked, or slammed. Moore continued:

> Q. Okay. In the arrest of Mr. Robinson, who did you see striking him?
>
> A. Nobody struck him.
>
> Q. Who did you see kicking him?
>
> A. Nobody kicked him.
>
> Q. Who did you see hitting him with a flashlight?
>
> A. Nobody hit him with a flashlight.

¶84. The physical evidence also supported Fox's theory that Robinson was accidentally,

40

or by misfortune, injured. Neither the State's expert witness Dr. LeVaughn nor the defense's three medical expert witnesses concluded that Robinson had any injuries consistent with the State's theory that Robinson was slammed into the ground or otherwise violently injured. AMR personnel testified that Robinson had a small abrasion on his forehead that had stopped bleeding naturally by the time they arrived. They covered the abrasion with a four-by-four bandage "folded in half, twice." AMR personnel testified that Robinson was alert and oriented and rated him at the maximum level of alertness on the Glasgow Coma Scale.

¶85. "[E]very accused has a fundamental right to have [his] theory of the case presented to a jury, even if the evidence is minimal." *Chinn v. State*, 958 So. 2d 1223, 1225 (¶13) (Miss. 2007). "In homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely." *Evans v. State*, 797 So. 2d 811, 815 (¶11) (Miss. 2000).

¶86. A reasonable jury could conclude from the physical evidence, along with the eyewitness testimony of the police officers, that Robinson's injuries were the result of accident or misfortune. The proposed instruction correctly stated the applicable law, was not covered by another instruction, and had foundation in the evidence. Therefore, even if we were to find the evidence sufficient to support the verdict, we would reverse on the failure to give the requested accident or misfortune jury instruction.

¶87. **REVERSED AND RENDERED.**

**CARLTON, P.J., GREENLEE, LAWRENCE AND SMITH, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. EMFINGER, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, McDONALD AND McCARTY, JJ.**

41

**EMFINGER, J., DISSENTING:**

¶88. As the majority opinion notes, conflicting evidence was presented to the jury regarding exactly what happened on the evening of Sunday, January 13, 2019. What is clear, however, is that George Robinson was forcibly removed from his vehicle by Fox and Lampley. Robinson was forced to the ground, with the officers restricting the use of his hands. During this process, Robinson's head hit the asphalt roadway. Robinson died as a result of a subdural hematoma caused by the blunt force trauma to his head during the altercation. Based on the evidence presented and the jury instructions given, I find the evidence was legally sufficient for twelve "reasonable, fair-minded [jurors], in the exercise of impartial judgment" to find Fox guilty of culpable-negligence manslaughter.[11] Therefore, I must respectfully dissent.

¶89. In *Eubanks v. State*, 341 So. 3d 896, 909-10 (¶41) (Miss. 2022), the supreme court repeated the familiar standard of review concerning the legal sufficiency of the evidence to

---

[11] The Attorney General filed a brief for the appellee and confessed error, admitting that the evidence was legally insufficient to support the conviction. An amicus brief was filed by the District Attorney contesting the Attorney General's confession of error as to the sufficiency of the evidence. Neither addressed the remaining issues Fox raises on appeal. Concerning confessions of error, this Court stated in *McCollum v. State*, 186 So. 3d 948, 953 (¶19) (Miss. Ct. App. 2016):

> As noted above, the State has confessed error and, thus, has not made any argument in defense of the trial judge's ruling on these grounds. Notwithstanding this confession of error, we have an obligation to examine the record to determine whether the conviction should stand or be reversed. *See Sibron v. New York*, 392 U.S. 40, 58 (1968).

Further, in *White v. State*, 616 So. 2d 304, 307 (Miss. 1993), the supreme court plainly stated that we are not bound to concessions on issues of law.

support a conviction:

> "When reviewing a challenge for sufficiency of the evidence, this Court must determine whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Naylor v. State*, 248 So. 3d 793, 796 [(¶8)] (Miss. 2018) (internal quotation marks omitted) (quoting *Ambrose v. State*, 133 So. 3d 786, 791 [(¶16)] (Miss. 2013)). "The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Id*. (internal quotation marks omitted) (quoting *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993)).

> > [I]f a review of the evidence reveals that it is of such quality and weight that, "having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense," the evidence will be deemed to have been sufficient.

*Id*. (quoting *Shelton v. State*, 214 So. 3d 250, 256 (¶29) (Miss. 2017)). In applying this standard, while we view the evidence and all the reasonable inferences that can be drawn therefrom in the light most favorable to the prosecution, *we must also disregard all evidence favorable to the defendant*. *See Parish v. State*, 176 So. 3d 781, 786 (¶17) (Miss. 2015); *Moore v. State*, 996 So. 2d 756, 760-61 (¶12) (Miss. 2008); *Withers v. State*, 907 So. 2d 342, 352 (¶29) (Miss. 2005); *White v. State*, 722 So. 2d 1242, 1246 (¶21) (Miss. 1998).

¶90. Regarding our standard of review, we are reminded that the jury determines the credibility of the witnesses and the weight of their testimony. In *Willis v. State*, 300 So. 3d 999, 1007 (¶25) (Miss. 2020), the supreme court wrote:

> But "[w]e do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Little* [*v. State*], 233 So. 3d [288,] 289 [(¶1) (Miss. 2017)].

Recently, in *Butler v. State*, 354 So. 3d 308, 320 (¶32) (Miss. Ct. App. 2022), this Court said:

> In reviewing the legal sufficiency of the evidence, our authority to disturb the jury's verdict is quite limited. *Clayton v. State*, 652 So. 2d 720, 724 (Miss. 1995). This Court has held that "[t]he jury is charged with the responsibility of weighing and considering conflicting evidence, evaluating the credibility of witnesses, and determining whose testimony should be believed. The jury has the duty to determine the impeachment value of inconsistencies or contradictions as well as testimonial defects of perception, memory, and sincerity." *Ford v. State*, 737 So. 2d 424, 425 (¶8) (Miss. Ct. App. 1999) (citation omitted).

So, in our analysis, we must resist pitting one witness's testimony against the testimony of another witness. We cannot discard the testimony of an eyewitness because *we* find the expert medical testimony to be more credible. In other words, we are not to re-weigh the evidence to determine whether we would find the defendant guilty. In fact, in applying this standard, this Court stated in *Lee v. State*, 369 So. 3d 625, 635 (¶26) (Miss. Ct. App. 2023):

> "We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the [requisite] elements. Rather, we must decide whether a reasonable juror could rationally say that the State did." *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010).

¶91. The State's burden of proof was set out in the trial court's instructions to the jury. In jury instruction 21, the trial court instructed the jury as follows:

> If you find unanimously that the State has failed to prove the elements of the crime of Second Degree Murder, you may then proceed in your deliberations to consider the lesser charge of Manslaughter.
>
> If you find from the evidence in the case beyond a reasonable doubt that:
>
> 1.  Anthony Fox;
>
> 2.  On, about, and between the 13th day of January, 2019 and the 14th day of January, 2019;

44

3.       In the First Judicial District of Hinds County;

4.       Unlawfully and with culpable negligence killed George Robinson, a human being;

5.       By using physical force on George Robinson to physically remove him from his vehicle, and slamming his head in to the roadway pavement;

Then you shall find Anthony Fox guilty of Manslaughter.

If the State has failed to prove any of the above listed elements beyond a reasonable doubt, then you shall find Anthony Fox not guilty of Manslaughter.

The trial court also gave jury instruction 12, which read in part:

Culpable negligence is negligence of a degree so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life. Negligence is doing something that a reasonably careful person would not do under similar circumstances or failing to do something that a reasonably careful person would do under similar circumstances.

¶92. As stated in the majority opinion, Pastor Longino was killed as he opened the doors to his church on Sunday morning, January 13, 2019. Jackson Police Department's (JPD) SWAT unit was called and spent the day searching for his killer. Around 6 p.m., JPD received a tip that the suspect in the murder investigation was hiding on Jones Avenue, so JPD responded in force to Jones Avenue.

¶93. Ronnie Arnold owned the house at 1729 Jones Avenue and was renting the house to Robinson, whom Arnold had known for five years. On January 13, Robinson called Arnold and asked him to come over to the house to barbecue and watch football. Arnold got to the house late in the afternoon when it was getting dark. Four or five other people were there. According to Arnold, Robinson had recently had a stroke and was moving more slowly. At

45

some point after Arnold arrived, Robinson went to the store to get something for the barbecue.

¶94.   When Robinson returned to the house, he parked in the front yard. Two of Robinson's friends asked Arnold for change so they could go across the street to "Ms. Connie's" to get some drinks or something. Since Arnold didn't have any change, he told them to go ask Robinson. Robinson was still sitting in his parked car when the two came to the driver's side window and asked him for change. At that point, Arnold testified about the law enforcement officers parked at the corner of Jones Avenue and Washington Street:

> They turned and jumped out and told the people to get away from the car and they started telling Mr. Robinson to get out of the car. And he was telling them, I can't move too fast, sir. He had a seatbelt on. He was trying to take his seatbelt off. Fox end up snatching the door open and grabbed him and throw him on the ground.

Arnold said that Fox was the first officer who went to Robinson's car.[12] According to Arnold's testimony, Fox was yanking on Robinson's car door and telling him to get out. That is when Robinson was telling Fox that he had just had a stroke and could not move quickly. Arnold stated that before Fox got Robinson out of the car, three or four other officers came to the car.

¶95.   Arnold said that Fox threw Robinson down onto the concrete near the driver's side back tire. Arnold noted that Robinson's head and his whole body made contact with the ground. Arnold further stated that Robinson's head hit the ground hard and started bleeding.

_____

[12] Arnold knew Fox from prior interactions with Fox. Fox had previously arrested him, and he had given Fox a written statement. Fox also had a relationship with a woman Arnold called his sister.

While Robinson was still on the ground, Fox had his knee on Robinson's back and his elbow on his shoulder, pushing Robinson's head up against the tire. According to Arnold, Fox held Robinson in this position for five or six minutes. While other officers were around, Fox was the one on the ground with Robinson. At some point, Fox handcuffed Robinson and pulled him up off the ground. When Arnold asked Fox whether Robinson was going to jail, Fox said that he was just being detained. Fox later told him Robinson was going to jail for resisting arrest. When they placed Robinson up against a police truck, Arnold testified, his head was down and he saw blood coming from his head; he looked like he was hurting. Between ten and fifteen minutes later, the ambulance arrived. The AMR patched up Robinson's head to stop the bleeding.

¶96.    Arnold said that they had Robinson handcuffed for about an hour and searched around his car. During this period, other officers came to the yard, and Arnold gave a couple of them a burger. They were talking about the preacher's murder. When Fox's attention turned back to locating the murder suspect, Robinson was released, and Fox told him to leave. After Robinson left, Arnold made sure his house was closed up. He later heard that Robinson was in the hospital.

¶97.    Connie Bolton, Robinson's friend who lived across the street at 1718 Jones Avenue, also witnessed the events and testified at trial. (Bolton is the person Arnold referred to as "Ms. Connie.") She testified that she sold drinks, chips, snacks, and other things from her house. She apparently heard the gunshot on the morning of January 13 when the preacher was killed. She had heard that the suspect lived in the area. When the prosecutor asked her

47

what happened to Robinson on that day, she said "he was beat up" by the "jump-out boys."

¶98. Bolton testified that she was sitting outside on her "ramp" with some relatives and friends at the time the incident involving Robinson began. She said that she saw Robinson getting into his car. She heard someone scream and heard brakes screeching, and "a lot of men jumped out of the car and then they went to his car." She stated that "they got in the car, in the front and the back." She said that while they were searching the car, one of the guys mashed Robinson into the steering wheel. She then saw one officer snatch Robinson out of the car and body slam him. When asked what she meant by that wording, she explained, "[H]e body slammed him and he dip him and swung him on the ground." All this happened on the driver's side of the car where she could clearly watch the events. She also said Robinson's head hit the asphalt roadway. When asked how his head made contact with the ground, she continued:

> When his head hit, then his body hit and then the guy raised his foot. And when his foot came down, I said, y'all come on. Let's go in the house.[13]

She told the jury that Robinson's head hit the concrete roadway forcefully. She repeated that when she saw Robinson getting stomped, she took the girls inside the house because they had seen it. When she took the girls inside the house, they questioned her about what they had seen. When Bolton went back outside, she started filming the event on her phone. At that point, Robinson was upright and the ambulance had arrived. She said she filmed because she

---

[13] Bolton had been asked earlier whether she was outside during the entire event, and she stated, "I went in when he raised his foot and stomped him. I took the girls in because they were looking over there." The girls she referred to were her nieces who were there with other members of her family.

wanted to show how mean the police were. During her video, which was introduced into evidence, the jury heard her say "They over here kicking people ass, they need to see it." On the video, she also said, "[D]on't know if he's going to jail or the hospital cause they worked him." After Robinson got up and was placed against an SUV, she saw that his head was bleeding. She went back inside her house before Robinson left the scene. In court, Bolton identified Fox as the person she saw "body slam" Robinson.

¶99. JPD Sergeant Lincoln Lampley also testified during the State's case-in-chief. Lampley testified that he and Fox both joined the JPD SWAT unit in 2015, but he had known Fox since they went to high school together. Their SWAT unit was activated early on January 13, 2019, in response to the murder of the pastor. Eventually they developed a suspect described as a young black male, seventeen to twenty-one years old, around five feet, seven inches tall, and a medium to light build. Lampley testified that Fox had information that led them to the Washington Addition area. They were conducting a "roll and patrol" where they were basically riding through the area looking for the suspect. They also hoped to interview people who could help them find the suspect. He was in the vehicle with Fox, and several officers were in vehicles behind them.

¶100. When they arrived at Jones Avenue, they saw a group of people standing in a yard around a barbecue. They decided to stop and talk with the people to see if they could provide any useful information about their suspect. Before exiting their vehicle, he and Fox had not discussed any suspicions Fox may have had about the activity at Robinson's vehicle. When they left their vehicle, Lampley went toward the group of people in the yard, and Fox went

49

toward Robinson's vehicle. Lampley had seen that someone was in the driver's seat and that a female was standing by the driver's window, but nothing seemed suspicious to him.

¶101. Before he could question anyone in the yard, he heard a commotion at Robinson's vehicle. He heard loud commands being made by Fox. Lampley could not remember exactly what was being said but testified that Fox sounded distressed. Lampley went to the driver's side of the car and saw that Fox had Robinson's left arm secured. As Fox was trying to remove Robinson from the car, Lampley noticed that Robinson was reaching between the seat and console with his hands. Fox was giving loud commands for Robinson to exit the car and to quit reaching. At that point Lampley drew his weapon and illuminated the light of his weapon so that he could see better. He described Fox and Robinson as being in a pretty good tug-of-war match, with Fox trying to get Robinson out of the car. When Lampley saw Robinson place both his hands between the seat and the center console, he holstered his weapon and began to assist Fox in removing Robinson from the vehicle. With Fox on Robinson's left side, Lampley reached in and grabbed Robinson's right shoulder to assist in removing him from the car. According to Lampley, they then pulled Robinson out of the vehicle together.

¶102. With Robinson out of the car and with Fox attempting to secure his left hand, Lampley was struggling to secure Robinson's right arm. With all three of them now facing the rear of the vehicle, Lampley said that Robinson was trying to go to the ground and had crossed his arms in front. Lampley testified that officers are trained to prevent a suspect in this situation from going to the ground. Lampley stated that even with them trying to hold Robinson up by

50

his arms, because of his weight, they could not hold him up, and he went to his knees. Lampley said that Robinson then went down onto his stomach, and they were still trying to pull his arms out from under him. Fox and Lampley continued to struggle to get Robinson's arms out from under him so that they could place handcuffs on him. Lampley believed Robinson was trying to hide something in his hands. From Lampley's perspective, once Robinson got his hands to his mouth, Robinson allowed them to control his arms and cuff him.

¶103.  Fox testified that his SWAT unit had been activated early on January 13 as a result of the robbery homicide. Later in the day, Fox's unit was directed back to Jones Avenue, where they had searched a house earlier in the day. At this point they had a photo of the suspect in the murder investigation. When they turned onto Jones Avenue, Fox said he was contacted by Officer Barney, who instructed him to pull over and talk to the people along the street. While Fox was pulling over to park, he saw Robinson's car and a female standing at the driver's side window. Using the lights on his SUV, Fox said he could see money in her hand, and then she "stuffed the money inside of the vehicle." According to Fox, this gave him a reasonable suspicion that "something was going on." On cross-examination, however, Fox admitted that he did not say anything to Lampley about seeing what he believed was a drug transaction before they exited the vehicle.

¶104.  Once out of his vehicle, Fox walked toward Robinson's vehicle. When the female looked at Fox, she withdrew her hand from inside the vehicle, and he could see that she still had the money in her hand. When the female began to walk away, Fox gave her an oral

command to stop. Fox testified that the female "speed walks off and disappears into the yard to the right." However, Fox still said nothing to the other officers.

¶105. Fox was at the trunk area of Robinson's vehicle, and he saw Robinson in the driver's seat and a large amount of money scattered on the passenger seat. Fox testified that "[i]t possibly, could have been what I appeared or assumed to be a drug transaction." Fox told the jury that when Robinson turned and saw him in a police uniform, "he, automatically, begins to start reaching with his right hand between the driver's seat and the center console."

¶106. At that point, Fox said that he gave loud, oral commands for Robinson to stop reaching and asked him what he was reaching for. With Robinson ignoring his commands, Fox said he opened the door and grabbed Robinson's arm. Fox said he was not trying to pull Robinson out of the vehicle at this point; instead, Fox was just holding him and telling him to stop reaching. According to Fox, Robinson then pulled him halfway inside the door frame and continued to twist his body toward the center console. Concerned that Robinson was reaching for a weapon, Fox un-holstered his weapon and, while still holding onto him with one arm, continued to give Robinson oral commands to stop reaching.

¶107. Fox stated that Lampley then joined the fray. Lampley started giving Robinson oral commands, and at the same time, pushed Fox forward to try and help him remove Robinson from the vehicle. Fox holstered his weapon and began using both hands in the effort to remove Robinson. Fox said that Lampley grabbed Robinson by his jacket and ducked Robinson's head out, and they pulled him out of the vehicle. Once out of the vehicle, Fox testified that Robinson "goes to a clutching posture," with his right hand over his left hand

52

in the area of his mid-section. The officers were telling Robinson to stop resisting as they were trying to pull his hands apart. At first Robinson was in a standing position, but he was trying to drop to the ground. According to Fox, they tried to "guide" him to the ground. Fox was holding Robinson's left arm, and Lampley was holding his right arm. Fox said when they could not hold him up, they just guided him to the ground: "it wasn't a slam. It wasn't a thump. It wasn't anything of that nature. We let his own body weight take him to the ground as we held him by the arms." Robinson was still moving around on the ground, and Fox believed he was trying to eat some dope. Fox said Robinson was moving his head on the asphalt and got into a half-fetal position. Once Robinson got his hands close to his mouth, he stopped resisting. Fox stated that they cuffed him while he was still on the ground.

¶108. On cross-examination, Fox admitted that no weapon was found on Robinson or in his vehicle. While Fox testified that he saw some drug "residue" in the vehicle, he did not include that in his report, and Robinson was not charged with any drug offense. After Robinson received some medical treatment, Fox "field released" Robinson on two misdemeanor charges: failure to obey and resisting arrest.

¶109. Dr. Mark LeVaughn testified as an expert in the field of forensic pathology. While he did not perform Robinson's autopsy, he reviewed the records from the autopsy, the medical records, and other information in forming his opinion as to the cause of Robinson's death. In the "Summary and Interpretation" portion of his report, which was admitted into evidence, LeVaughn opined:

> This 62 year old male identified as George Robinson died as a result of multiple blunt injuries to his head. This is evidenced by facial abrasions, scalp

contusions, brain contusions, subdural hematoma and brain swelling. These injuries resulted in his death. In addition there was evidence of hypertensive and atherosclerotic cardiovascular disease. Toxicology was non-contributory in his death. Medical records were reviewed. With the currently available information and postmortem findings, the cause of death is Multiple Blunt Head Trauma and the manner of death is Homicide.

At trial, LeVaughn testified that there were at least three blunt injuries to Robinson's head because there were three separate abrasions. He indicated that these injuries were consistent with someone's head impacting pavement, but he testified that he could not determine, to a reasonable degree of medical certainty, how much force was required to cause these injuries. While he agreed with defense counsel that such injuries *could* be caused by slight force, he maintained that he could not determine the amount of force that caused Robinson's injuries.[14] The amount of force, however, is not the issue here. Clearly, LeVaughn testified that Robinson died as a result of injuries he received during this event. The question is whether Fox's culpable negligence caused the injuries.

¶110. Before the jury could consider culpable-negligence manslaughter, the court instructed the jury that they must first find Fox not guilty of second-degree murder, the indicted charge.[15] The question now is whether the evidence, viewed in the light most favorable to the prosecution, is sufficient to prove beyond a reasonable doubt that Fox exhibited negligence

---

[14] In their attempt to minimize the amount of force used against Robinson by Fox, the defense experts emphasized that such injuries could be caused by slight force. However, this testimony could also serve to show that it is foreseeable that if you allow someone's head to impact the pavement in this situation, it can cause death or serious bodily injury.

[15] Because Fox was acquitted of intentional murder as charged in the indictment, the majority's argument that "we must take the indictment as written" is not relevant to the lesser offense of culpable-negligence manslaughter.

of a degree that shows an utter indifference to the safety of human life when he forced Robinson from his vehicle and caused/allowed his head to hit the paved roadway.

¶111. The majority states, "Without any credible evidence that Fox acted unreasonably or used unreasonable force, it follows that a rational person could not conclude that Robinson's death was a foreseeable result of Fox's actions." As noted above, however, if the injuries that caused Robinson's death can be caused by slight force, it is clearly foreseeable that causing/allowing a person's head to hit the pavement creates an unreasonable risk to the safety of human life. Accordingly, we must determine whether Fox's actions were reasonable. If Fox did not have a reasonable suspicion that Robinson was involved in illegal activity, he had no lawful right to remove him from his vehicle. Thus, any force that he used would be unreasonable.

¶112. In *Spurlock v. State*, 67 So. 3d 811, 813-14 (¶9) (Miss. Ct. App. 2011), this Court reasoned:

> Both the United States Constitution and the Mississippi Constitution protect "an individual's right to be free from unreasonable searches and seizures." *Dies* [*v. State*], 926 So. 2d [910,] 917-18 (¶21) [(Miss. 2006)] (citing *Floyd* [*v. City of Crystal Springs*], 749 So. 2d [110,] 114 (¶14) (Miss. 1999)). The prohibition against unreasonable searches and seizures extends to brief investigatory stops of a vehicle. *Id*. at 918 (¶21). However, "[t]he constitutional requirements for an investigative stop are less stringent than those for a full arrest." *Id*. at (¶22) (citing *Floyd*, 749 So. 2d at 114 (¶16)). The Mississippi Supreme Court has held that investigative stops are permissible, provided that an officer has "reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a felony or as long as the officers have some objective manifestation that the person stopped is, or is about to be[,] engaged in criminal activity." *Id*. (quoting *Floyd*, 749 So. 2d at 114 (¶16)) (emphasis added).

In most cases the issue of whether an officer had a "reasonable suspicion" to justify a temporary detention is presented to the trial court in a pre-trial motion to suppress evidence. As a matter of law, the court makes the decision based upon the facts presented. If the proper showing is made, the evidence is admitted. If the evidence fails to show the officer had a reasonable suspicion, the evidence is excluded.

¶113. However, in the present case the issue was presented to the jury for its decision. Jury instruction 17 provided, in part:

> You're instructed that in determining whether or not there was a reasonable suspicion for the temporary seizure of George Robinson, you are to determine whether or not any reasonable law enforcement officer confronted with the same information and circumstances with which the defendant was confronted would have reason to conclude that criminal activity may be afoot.

> If you find beyond a reasonable doubt from the evidence in this case that Defendant Anthony Fox, a law enforcement officer, did not have reasonable suspicion to order George Robinson out of his vehicle, then that command was unlawful, and it was lawful for George to resist that command.

Fox notes in his brief that he at first objected to this instruction, but he later withdrew his objection. He recognizes that he cannot now challenge the instruction on direct appeal. I find, however, that the question of whether Fox had a "reasonable suspicion" to detain Robinson was not a question of fact for the jury to decide. Instead, the trial court should have made that decision and then should have instructed the jury accordingly. *See Keys v. State*, 963 So. 2d 1193 (¶¶29-35) (Miss. Ct. App. 2007).[16]

---

[16] The majority contends that the issue of any possible Fourth Amendment violation by Fox is not properly before the Court. I disagree. As noted, the jury was instructed on this issue and was given competing jury instructions, depending on its decision on this issue. If the jury found that Fox did not have a lawful right to remove Robinson from the car and, therefore, acted unreasonably, this could be a part of the jury's finding that Fox acted with

56

¶114. In any event, the jury here had to determine Fox's credibility on this issue. Fox described for the jury the things he viewed that, he argued, gave him a reasonable suspicion to believe illegal drug activity was afoot. The State put on testimony to show that the person standing next to Robinson's car was there seeking change to go buy a drink from Ms. Bolton across the street. Further, in its cross-examination of both Fox and Lampley, the State called Fox's credibility into question by showing that he did not say anything to Lampley about his suspicions before they got out of the car together. Lampley testified that he saw the car and the woman, but his suspicions were not aroused. Fox testified that Robinson immediately turned to the center console when Fox ordered him out of the vehicle. This caused Fox to believe Robinson was reaching for a weapon. However, while Fox said Robinson was not wearing a seat belt, Arnold testified that Robinson was wearing his seat belt. Arnold said that at the time the officers snatched Robinson from the car, Robinson was trying to take his seat belt off and telling Fox that he was moving slowly because he had recently suffered a stroke.

¶115. We cannot know with certainty the jury's decision on this issue because criminal juries do not answer questions regarding their verdict as is done in some civil cases. But if the jury found that Fox did not act lawfully in commanding that Robinson exit his vehicle, then the jury could well have found that Fox acted unreasonably and was the aggressor in this event, according to the instructions.

¶116. The Attorney General, in confessing error in this case, and the majority opinion both rely heavily on this Court's decision in *Brown v. State*, 304 So. 3d 692 (Miss. Ct. App. 2020).

---

a "wanton disregard" for Robinson's safety.

I find that the evidence in *Brown* presents a completely different picture than do the facts in the case at bar. In *Brown*, the deceased, Quiney, was partying with friends at Antonio's Bar & Grill. *Id*. at 694 (¶2). When a fight broke out between two other men, Quiney tried to remove one of the men from the bar. *Id*. Brown, a security guard employed by the bar, then tried to remove Quiney from the bar. *Id*. at (¶3). When Brown put his hands on Quiney, Quiney fell to the floor unconscious. *Id*. Brown attempted CPR, and Quiney was transported to the hospital where he died. *Id*. Brown was indicted and tried for culpable-negligence manslaughter. *Id*.

¶117. At trial, Quiney's friend Magsby testified that Quiney had one man involved in the fight under control and was trying to take him out the door. *Id*. at (¶4). Then Brown stepped in and wrapped his arms around Quiney's neck and "choked him to the ground." *Id*. Other witnesses disputed Magsby's account and testified that Brown did not choke Quiney. *Id*. at (¶5). While that would then seem to be a jury question as to credibility, the medical testimony from Dr. LeVaughn was determinative. *Id*. at (¶7). LeVaughn found that the cause of Quiney's death was "complications of hypertensive cardiovascular disease associated with a physical altercation." *Id*. Most importantly, however, LeVaughn testified that there was no evidence of choking. *Id*. at (¶8).

¶118. The facts in *Brown* show that Brown's contact with Quiney was of a relatively short duration after Quiney had been involved in an altercation with others. *Id*. at (¶2). In the case at bar, the effort to remove Robinson from his car took substantially longer, and two officers were involved in the effort. In *Brown*, there were external injuries, but LeVaughn did not

conclusively find that they were caused by Brown's interaction with Quiney. *Id*. at 694-95 (¶9). Whereas in the present case, Robinson suffered three blunt force injuries to his head. Quiney's death was, at most, indirectly caused by Brown's actions. *Id*. at 694 (¶4). Robinson's death was directly caused by the injuries he suffered as a result of Fox and Lampley forcibly removing him from his car and causing/allowing his head to strike the pavement. Brown was employed as a security guard and had the authority to remove unruly patrons from the bar. *Id*. at (¶2). In the present case, the jury may well have found that Fox was not acting lawfully when he forced Robinson from his vehicle.

¶119. In addition to the legal sufficiency of the evidence, Fox also challenged the weight of the evidence and certain instructions that were given and refused by the court. As stated by the majority opinion, whether the jury ultimately believed all of Fox's testimony, his testimony was sufficient to support his requested jury instruction D-9. Fox's theory of the case was that Robinson's death was the result of "an accident or misfortune" that occurred while Fox was engaged in a lawful act by lawful means and exercising usual and ordinary caution and without any unlawful intent. Miss. Code Ann. § 97-3-17(a) (Rev. 2014). A defendant is entitled to a jury instruction on his theory of the case when there is evidentiary support for such an instruction. *See Jenkins v. State*, 371 So. 3d 593, 597 (¶25) (Miss. 2023). The failure to give jury instruction D-9 was reversible error.

¶120. The jury was free to believe the eyewitness testimony of Arnold and Bolton describing how Fox and Lampley removed Robinson from his vehicle. The jury also could have believed their description of Robinson being "body slammed" to the ground and his head

hitting the pavement hard and starting to bleed. This, together with Dr. LeVaughn's testimony that Robinson died from these head injuries, was sufficient to support the jury's verdict. The jury acquitted Fox of second-degree murder but convicted him of culpable-negligence manslaughter.

¶121. In a similar case, *Shumpert v. State*, 935 So. 2d 962 (Miss. 2006), Shumpert and two others were charged with depraved heart murder in the beating death of Jimmy Collier. *Id*. at 965 (¶1). Shumpert went to trial and was acquitted of depraved heart murder, but he was convicted of culpable-negligence manslaughter. *Id*. In affirming the conviction, the court said:

> In the current case, the jury was instructed on both depraved heart murder and culpable negligence manslaughter, and decided that manslaughter was more appropriate. In addition, **there was conflicting evidence at trial, which makes it implausible on appeal to ascertain what version of the story the jury believed**. Shumpert is asking this Court to make the broad declaration that intentional acts cannot form the basis for culpable negligence. However, **"[c]ulpable negligence must be ascertained from the facts of each case, and no ironclad statement can be set forth as applicable to all classes of cases."** *Sims v. State*, 149 Miss. 171, 115 So. 217, 219 (1928).
>
> Shumpert also seeks to make a distinction between an intentional act leading to death and a negligent, or accidental act leading to death, arguing that because he intended to deliver the blow to Collier, he cannot be guilty of manslaughter by culpable negligence. This attempted distinction is flawed because manslaughter by culpable negligence is "such gross negligence . . . as to evince a wanton or reckless disregard for the safety of human life, or such an indifference to the consequences of an act under the surrounding circumstances as to render such conduct tantamount to willfulness." *Evans v. State*, 562 So. 2d 91, 95 (Miss. 1990) (citations omitted). **The only requirement is recklessness or a willful disregard for an unreasonable risk**. *Campbell v. State*, 285 So. 2d 891, 893 (Miss. 1973). **Furthermore, a recognized distinction between manslaughter by culpable negligence and depraved heart murder concerns the degree of mental culpability**. *Windham v. State*, 602 So. 2d 798, 801 (Miss. 1992). **The determination of**

60

> **a defendant's mental culpability is an issue properly resolved by the jury**.
> *Morris v. State*, 748 So. 2d 143, 148 (Miss. 1999).

*Id*. at (¶¶13-14) (emphasis added). In the present case, Fox's acts of forcibly removing Robinson from his vehicle and forcing him onto the pavement were intentional acts (and perhaps unlawful pursuant to the court's instructions to the jury). Fox's act in causing/allowing Robinson's head to impact the pavement was negligent and caused the injuries that caused Robinson's death. We can conclude from the jury's verdict that they unanimously found, beyond a reasonable doubt, that Fox was guilty of culpable-negligence manslaughter because Fox's actions evidenced a "wanton disregard of, or utter indifference to, the safety of human life."

¶122. The jury heard the evidence and followed the instructions in rendering their verdict. In *Clanton v. State*, 365 So. 3d 203, 216 (¶48) (Miss. 2023), the supreme court stated:

> "It is presumed that jurors follow the instructions of the court." *Johnson v. State*, 475 So. 2d 1136, 1142 (Miss. 1985) (citing *Payne v. State*, 462 So. 2d 902, 904 (Miss. 1984); *Carter v. State*, 450 So. 2d 67, 69 (Miss. 1984)) (finding no prejudice when the trial court instructed the jury to disregard the court's reading of the wrong indictment). As the *Johnson* Court stated, to presume a jury would refuse to follow the instruction of the court "would be to render the jury system inoperable." [*Johnson*, 475 So. 2d at 1142].

¶123. The jury was instructed as to their duty to consider the testimony of all the witnesses and their evidence. The jury was to determine credibility and the weight to give each witness's evidence. The jurors were told it was their responsibility to resolve any conflicts in the evidence. They were instructed that their verdict should be based on the evidence and not speculation, guesswork, or conjecture.

¶124. Twelve jurors unanimously agreed that the State had proved beyond a reasonable

doubt, according to the instructions they were given, that Anthony Fox was guilty of culpable-negligence manslaughter. The effect of the majority opinion is to find that those twelve jurors were not reasonable or rational. In years past, courts have been reluctant to make such a finding. In *Cook v. State*, 248 So. 2d 434, 436 (Miss. 1971), in another culpable-negligence manslaughter case, the supreme court stated:

> However, the Court is reluctant to discharge the appellant in this case even though the evidence of culpable negligence is meager and barely enough to escape a peremptory instruction. The Court is of the opinion that this case should be passed upon by another jury. . . . This is such a close case on the question of criminal liability under the culpable negligence statute that we are of the opinion this case should be decided by another jury under proper instructions, both for the state and the appellant.

¶125. In the present case, I would find that the evidence was legally sufficient to support the jury's verdict according to the instructions they were given. However, I find that the jury was not properly instructed in several respects and would reverse the conviction and remand the matter for a new trial with proper instructions.

**WESTBROOKS, McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**